IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| TIMMY JOHN WEBER,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 62473 |

FILED

JUN 24 2016

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

### ORDER AFFIRMING IN PART, REVERSING IN PART AND REMANDING

This is an appeal from a district court order denying a postconviction petition for a writ of habeas corpus in a death penalty case. Eighth Judicial District Court, Clark County; Douglas Smith, Judge.

Appellant Timmy John Weber lived in Las Vegas with his girlfriend Kim, her two sons (17-year-old C.G. and 15-year-old A.G.), and her daughter (14-year-old M.G.). Although he was Kim's boyfriend, Weber treated M.G. more like his girlfriend. He started to abuse M.G. sexually and took photographs documenting the abuse. That abuse escalated on the morning of April 4, 2002.

That morning Weber and M.G. were home alone; C.G. had spent the night at his friend Joey's apartment, Kim had gone to visit one of her friends, and A.G. had left to go skateboarding. Weber and M.G. had argued the previous night after a male friend called M.G., and she was still upset the next morning. After she refused Weber's request that she give him a hug and told him that she wanted to see her boyfriend, he locked the front door to the house, pinned M.G. on the couch, and duct-

16-19772

taped her hands together behind her back. When she screamed, Weber told her to shut up, put duct tape around her head, and forced her into a bedroom, throwing her on the bed and taping each foot individually and taping her feet to her hands. Weber left, threatening to kill M.G. if she attempted to escape. About 45 minutes later, Weber returned and sexually assaulted her. After allowing M.G. to shower, he put socks over her hands, duct-taped them, and then duct-taped her legs together. He also duct-taped her head and body to the ladder of her bunk bed so that she could not move. After telling M.G. that he was going to check on her 15-year-old brother A.G., Weber turned up the volume on a television set, covered her with a blanket, and left the room.

Meanwhile, A.G. had met up with C.G. and was hanging out with him at Joey's apartment. About two hours after the assault on M.G., A.G. and Joey saw Weber sitting in his car near Joey's apartment. At the time the boys were returning to the apartment after going to get snacks. A.G. went to speak with Weber. When he returned to the apartment, he told Joey that Weber said he had to go check in with Kim. A.G. left the apartment and got into Weber's car.

About thirty minutes later, C.G. woke up from a nap and he too went home. But when he got there, the doors were locked and he could not get in through any windows. Hearing a loud television and a muffled scream from M.G.'s room, he went back to Joey's apartment to get help. When C.G. returned with a friend, they heard screams. C.G. broke a window, entered the house, and let his friend in through the front door. They found M.G. taped up in her room. Upon removing the tape over her mouth, they learned of Weber's attack. Fearful that Weber would return, they left the house and headed to Joey's apartment. While C.G. went to a

nearby gas station to call the police, Weber drove up to Joey's apartment building and asked if anyone had seen M.G. After Weber drove away, C.G.'s friend flagged down a passing patrol car and M.G. told the officer about Weber's assault on her. The officer took C.G. and M.G. home. While conducting a protective sweep of the home, the officer discovered Kim's and A.G.'s bodies.

Kim, who had left her friend's home a little before 11:00 a.m. (about 90 minutes before Weber sexually assaulted M.G. in her room), was found stuffed in a rubber container located in her bedroom closet. She was naked. Her neck displayed a number of marks suggesting strangulation. She suffered two blunt force trauma wounds on the back of her head, causing a fractured skull. She also had bruising and scrapes on her arm and knees.

A.G. was found in his bedroom, lying face down on his bed. His head was covered with a black plastic bag that was secured around his neck. His arms, hands, and wrists were bound behind his back with duct tape, and his ankles were bound together with duct tape. A white t-shirt was stuffed inside his mouth, and duct tape was wrapped around his head, covering his eyes and mouth. Two 45-pound weights had been placed on his upper and lower back, and two 50-pound weights had been placed on his legs. A.G. died from mechanical asphyxia, suffocation, and compression and restriction of his torso. Tears in the duct tape around A.G.'s hands indicated that he struggled to free himself and the presence of blood and vomit in the bag around his head indicated that A.G suffered a very slow death.

Weber fled Las Vegas after the murders but returned before the funeral services for Kim and A.G. on April 14, 2002. Before the

services that day, C.G. returned to the family home with William Froman, C.G. and M.G.'s temporary guardian, to retrieve a few items. Immediately upon entering the home, Froman was attacked by Weber, who struck Froman on the head with a baseball bat, fracturing his skull. Weber also hit C.G., drawing blood. Weber fled but was captured about two weeks later in a trailer home in Las Vegas.

A jury convicted Weber of sexual assault on a child under 14 (Count 1), sexual assault on a child under 16 (Counts 2, 3, and 11), open or gross lewdness (Counts 4, 5, and 6), use of a minor in producing pornography (Count 7), possession of a visual presentation depicting sexual conduct of a person under 16 (Count 8), burglary (Counts 9 and 15), first-degree kidnapping (Counts 10 and 13), first-degree murder with the use of a deadly weapon (Counts 12 and 14), and attempted murder with the use of a deadly weapon (Counts 16 and 17).

At the conclusion of the penalty hearing, the jury found 13 circumstances aggravated A.G.'s murder, all of which stemmed from the incidents on April 4 and 14—(1) sexual assault on a child under the age of 14; (2), (3), (4) sexual assault on a child under the age of 16; (5) first-degree kidnapping of M.G.; (6) first-degree kidnapping of A.G; (7) attempted murder of C.G. with the use of a deadly weapon; (8) attempted murder of Froman with the use of a deadly weapon; (9) the murder was committed during the perpetration of a burglary; (10), (11) the first-degree kidnapping of A.G. and M.G.; (12) the murder involved torture or mutilation; and (13) Weber had been convicted in the immediate proceeding of more than one offense of murder. At least one juror found the following mitigating circumstances: (1) Weber had an unstable upbringing, (2) his family loved him, (3) his family would suffer as a result

Supreme Court
OF
Nevada

(O) 1947A

4

of the imposition of a death sentence, (4) he had a history of good behavior while incarcerated at the Clark County Detention Center, (5) he had a history of good behavior while incarcerated at the Nevada State Prison, (6) he had no prior history of crimes of violence, (7) his age at the time of his prior criminal history, (8) his current age, (9) he did not resist arrest, (10) he had a normal upbringing, (11) his lack of financial stability, (12) the State's witnesses did not request death, and (13) his display of emotion during the penalty phase. Concluding that the aggravating circumstances outweighed the mitigating circumstances, the jury sentenced Weber to death for A.G.'s murder. With the exception of the torture aggravating circumstance, the jury found the same circumstances aggravated Kim's murder but sentenced Weber to a term of life in prison without the possibility of parole. On appeal, this court affirmed the judgment of conviction and death sentence. *Weber v. State*, 121 Nev. 554, 119 P.3d 107 (2005).

Weber filed a pro se postconviction petition for a writ of habeas corpus on March 22, 2006, which was supplemented by counsel on February 27, 2007. The district court denied the petition on November 7, 2007, without conducting an evidentiary hearing. This court affirmed the district court's judgment on July 20, 2010, and remittitur issued on October 18, 2010. *Weber v. State*, Docket No. 50613 (Order of Affirmance, July 20, 2010). Weber filed a second postconviction petition on September 22, 2011, and an amended petition on March 12, 2012. The district court denied the petition on December 10, 2012, without conducting an evidentiary hearing. This appeal followed.

Weber argues that the district court erroneously denied his second petition as procedurally barred without conducting an evidentiary

hearing. Because he filed the petition almost six years after this court issued its remittitur in his direct appeal, the petition was untimely under NRS 34.726(1). The petition was also successive and therefore procedurally barred pursuant to NRS 34.810(1)(b)(2). As cause to overcome the procedural default rules, Weber contends that his first postconviction counsel was ineffective for failing to raise several claims of ineffective assistance of trial and appellate counsel.

*Postconviction counsel*

Because Weber's first postconviction counsel was appointed pursuant to a statutory mandate, NRS 34.820(1), Weber was entitled to effective assistance of that counsel as a matter of state law and a meritorious claim that postconviction counsel provided ineffective assistance may establish cause under NRS 34.810(1)(b) for raising new claims in a second postconviction proceeding. *Crump v. Warden*, 113 Nev. 293, 304-05, 934 P.2d 247, 253-54 (1997); *see also Rippo v. State*, 132 Nev., Adv. Op. 11, ___ P.3d ___ (2016). But the postconviction-counsel claim must not be procedurally defaulted. *Hathaway v. State*, 119 Nev. 248, 252, 71 P.3d 503, 506 (2003). Here, the postconviction-counsel claim is subject to the time limit set forth in NRS 34.726(1), *State v. Eighth Judicial Dist. Court (Riker)*, 121 Nev. 225, 235, 112 P.3d 1070, 1077 (2005), so the postconviction-counsel claim had to be raised within a reasonable time after it became available, *Hathaway*, 119 Nev. at 252-53, 71 P.3d at 506. We conclude that Weber filed his petition asserting the postconviction-counsel claims as good cause within a reasonable time as the petition was filed within one year after this court issued its remittitur in the first postconviction appeal. *Rippo*, 132 Nev., Adv. Op. 11, ___ P.3d

at ___. Weber must still show that his postconviction claims have merit to overcome the procedural bars.[1]

Weber argues that postconviction counsel was ineffective for omitting a variety of challenges to the effectiveness of trial and appellate counsel. To establish that postconviction counsel was ineffective, Weber must demonstrate both deficient performance (that counsel's performance fell below an objective standard of reasonableness) and that counsel's performance prejudiced him in the prior habeas proceeding (that the outcome of that proceeding would have been different but for counsel's deficient performance). *Id.* at ___; *see also Crump,* 113 Nev. at 304 & n.6, 934 P.2d at 254 & n.6 (indicating that test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984) would be used to evaluate postconviction counsel's assistance). Where postconviction counsel's alleged ineffectiveness is based on omitted claims regarding ineffective assistance of trial and/or appellate counsel, the merit of the postconviction-counsel claim generally is dependent on the merits of the omitted trial- and appellate-counsel claims. *See Rippo,* 132 Nev., Adv. Op. 11, ___ P.3d at ___. The same two-part test set forth above applies to the trial- and

---

[1]In addition to the procedural bars in NRS 34.726 and NRS 34.810, the statutory laches bar under NRS 34.800 also applies because the State pleaded it below. *See* NRS 34.800(2) (requiring that State specifically plead laches). The district court determined that the petition was subject to laches and the rebuttable presumption of prejudice. Weber does not expressly challenge that decision in his appellate briefs even though the State addresses NRS 34.800 in its answering brief. As a result of Weber's omission, we could have summarily affirmed the district court's decision based on NRS 34.800. Weber's counsel should be mindful to avoid similar omissions in the future.

appellate-counsel claims. *Strickland*, 466 U.S. at 687-88; *Warden v. Lyons*, 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*); *Kirksey*, 112 Nev. at 998, 923 P.2d at 1114 (applying *Strickland* test in context of appellate-counsel claim). Both deficiency and prejudice must be shown, *Strickland*, 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). This court gives deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but reviews the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

### Omitted trial-counsel claims

Weber argues that the district court erred by denying his claim that postconviction counsel was ineffective for not challenging trial counsel's representation in three respects: jury selection, pretrial investigation and conduct of the guilt phase, and investigation of mitigation evidence and conduct of the penalty phase.

### Jury selection

Weber faults postconviction counsel's failure to assert that trial counsel provided ineffective assistance during jury selection when they waived peremptory challenges and failed to meaningfully question potential jurors, "life-qualify" the jury, exclude jurors who could not consider all forms of punishment, exclude jurors who misunderstood the State's burden of proof and the defense's lack of any burden of proof, question jurors about their personal experiences that likely biased them against him, and adequately question the jury about pretrial publicity. To support his argument on appeal, Weber cites to his postconviction petition, where he provided a fuller explanation of these trial-counsel claims.

SUPREME COURT
OF
NEVADA

(O) 1947A

8

However, mere citation to the pleadings below is inappropriate, NRAP 28(e)(2), and insufficient to meet his burden to provide cogent argument, *Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987), that explains how the district court erred. Moreover, the omitted trial-counsel claims are speculative and not borne out by the record. Therefore, he has not shown that postconviction counsel was ineffective in omitting them.

*Investigation and guilt phase*

Weber next faults postconviction counsel for not asserting that trial counsel were ineffective because they failed to attack the credibility of Robin Thornton, M.G., and affidavits used to establish probable cause for the search warrants. We conclude that the suggested attacks on Thornton's credibility based on her drug use and criminal history and on M.G.'s credibility because she had not witnessed Weber's credit card fraud would not have convinced the trial court to grant his motion to suppress the evidence obtained when the search warrants were executed. Therefore, he has not demonstrated that prior postconviction counsel's omission of this trial-counsel claim was ineffective.

Weber also faults postconviction counsel for not asserting that trial counsel were ineffective because they based the allocation of resources to his case on the results of a polygraph test that counsel required him to take. Even assuming that the underlying factual allegation is true, he does not point to any course of action that trial counsel did not undertake due to the results of his polygraph. As he established no basis for this challenge to trial counsel's performance, he has not demonstrated that postconviction counsel was ineffective for not raising this claim.

Weber further faults postconviction counsel for not asserting that Weber likely would not have been convicted of first-degree murder

SUPREME COURT
OF
NEVADA

(O) 1947A

had trial counsel investigated and presented evidence of his brain damage. As support, he points to an evaluation by neuropsychologist Dr. Ruben Gur that indicates he suffered from brain damage. Although the evaluation suggests that Weber has difficulty controlling his emotions in situations that he perceives to be threatening, it does not demonstrate that he was incapable of forming the necessary intent for first-degree murder by premeditation or torture (the two theories alleged by the prosecution) and therefore the evaluation provided no basis for postconviction counsel to assert this trial-counsel claim. Accordingly, we conclude that Weber failed to show that postconviction counsel was ineffective in this regard.

In his final challenge related to the defense investigation, Weber faults postconviction counsel for failing to assert that trial counsel were ineffective in the defense theories that they presented. He takes issue with trial counsel's alternative-suspect theory on the ground that it had little evidentiary support and with trial counsel's consent defense to the sexual assault charges because the jurors might have considered such a defense repugnant. He suggests that they should have pursued a mental health defense. Although Weber disagrees with the defense theories pursued at trial, his general assertion that another theory would have provided a better defense is not a sufficient basis on which prior postconviction counsel could have asserted that trial counsel were ineffective. *See Rios v. Rocha*, 299 F.3d 796, 807 (9th Cir. 2002) ("Once counsel reasonably selects a defense, it is not deficient performance to fail to pursue alternative defenses."); *Hunt v. State,* 940 So. 2d 1041, 1067 (Ala. Crim. App. 2005) ("'[T]he mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on

counsel's failure to present that theory.'" (quoting *Rosario–Dominguez v. United States,* 353 F. Supp. 2d 500, 513 (S.D.N.Y. 2005))). Because Weber has not established a sufficient basis for the omitted trial-counsel claim, he has not demonstrated that prior postconviction counsel was ineffective for not raising it.

### *Penalty-phase claims*

Weber argues that postconviction counsel should have alleged that trial counsel were ineffective for encouraging the jury to sentence him to death. Considering the challenged comments in context, trial counsel did not encourage jurors to impose a death sentence; rather, they implored the jury not to impose a death sentence because that sentence would not bring the victims back to their family, told the jury that it had the power to stop the killing in this case, and suggested that killing Weber in retaliation for his actions would not compensate the victims' family for their loss. Trial counsel further argued that incarcerating him forever was severe punishment and entreated the jury to select that option rather than death. As Weber demonstrated no basis on which prior postconviction counsel could have successfully challenged trial counsels' performance in this respect, we conclude that he failed to show that postconviction counsel was ineffective.

### *Mitigation*

Weber next argues that postconviction counsel should have asserted that trial counsel provided ineffective assistance by not investigating and presenting additional evidence concerning his upbringing, family history, and mental illness. We are not convinced that this trial-counsel claim was so strong that postconviction counsel's failure to raise it fell below an objective standard of reasonableness.

*Strickland* acknowledges counsel's obligation to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. 668, 691 (1984); *see also Wiggins v. Smith,* 539 U.S. 510, 521-23 (2003) (recognizing counsel's duty to investigate). Preparing for a capital penalty hearing generally includes a duty to thoroughly investigate a defendant's background for possible mitigating evidence, *see Williams v. Taylor,* 529 U.S. 362, 396 (2000), but "reasonable" does not mean that an investigation must be so exhaustive as to uncover all conceivable mitigating evidence, *see Waldrop v. Thigpen,* 857 F. Supp. 872, 915 (N.D. Ala. 1994).

It is evident from the record that trial counsel investigated and prepared for the penalty hearing, as several family members testified about Weber's childhood and a mental health expert provided insight into his upbringing as well as his personality. While the new mitigation evidence presents a more robust picture of Weber's childhood and delves deeper into his mental health than the mitigation case presented at trial, we are not convinced that he established that counsel's investigation was deficient. Several of Weber's family members were interviewed in preparation for the penalty hearing, but none of them described the level of physical abuse at the hands of his parents and other relatives that he now describes. Nor did any of those witnesses describe the full extent of his parents' criminal activity or Weber's mother's alcohol abuse. Notably, both Weber and his mother denied any history of physical or sexual abuse when interviewed by the defense mental health expert who testified at trial. Weber also does not assert that trial counsel had reason believe that he had mental problems that required investigation or evaluation beyond that provided by the expert who testified at trial—none of the witnesses

interviewed for trial indicated that Weber had any mental health issues and Weber indicated to his defense team that he had "no psychological profile" and that there was nothing in his background that would explain his actions. Given this record, it is not clear that prior postconviction counsel's failure to challenge trial counsels' investigation and presentation of mitigating evidence was ineffective.

Even if there were sufficient grounds for prior postconviction counsel to assert that trial counsel were deficient in their investigation and presentation of mitigation evidence, counsel still would have had to demonstrate prejudice. Presenting negative aspects of Weber's upbringing, his mental health, and brain damage, as opposed to or in addition to the mitigation evidence presented at trial showing positive and gentle aspects of his character, would have been risky. The jurors could have viewed the new evidence as mitigating, but they could have just as easily considered the evidence to be aggravating, showing that his exposure to violence, physical abuse and neglect, mental illness, and brain damage that coalesced into unimaginable violence made him unredeemable or a continuing danger. *See Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1410 (2011) (observing that evidence of defendant's family's substance abuse problems, mental illness, and criminal history was "by no means clearly mitigating, as the jury might have concluded that [defendant] was simply beyond rehabilitation"); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (recognizing that mitigating evidence can be a "two-edged sword" that juries might find shows future dangerousness); *see also Kansas v. Carr*, ___ U.S. ___, 136 S. Ct. 633, 642 (2016) ("Whether mitigation exists . . . is largely a judgment call (or perhaps a value call); what one juror might consider mitigating another might not."). Although

some of the new mitigating evidence suggests that Weber was nonaggressive by nature but, due to his traumatic upbringing, mental illness, and brain damage, he reacted violently in situations where he was frightened or threatened, the circumstances of the offenses at issue here do not suggest a frightening or threatening situation. For example, the evidence suggested that Weber sought out A.G., bringing him back to the home for no purpose other than to kill him in a manner that inflicted a great deal of pain and suffering. Under the circumstances, we conclude that the new mitigation evidence would not have altered the outcome of the penalty hearing. Thus, for this reason as well, we conclude that he has not demonstrated that postconviction counsel was ineffective for not challenging trial counsel's performance in this regard.[2]

*Other matters*

Weber also argues that postconviction counsel should have asserted that trial counsel were ineffective for not objecting "to the numerous unlawful and erroneous aggravating circumstances, jury instructions and prosecutorial misconduct that pervaded the penalty

---

[2]Weber complains that postconviction counsel should have asserted that trial counsel inadequately prepared the mental health expert for trial. However, postconviction counsel raised a substantially similar claim, challenging trial counsel's reliance on the expert because the expert failed to perform a proper evaluation and was unable to offer a psychological opinion explaining why Weber committed the offenses. *Weber v. State*, Docket No. 50613 (Order of Affirmance July 20, 2010), at 5-6. We conclude that this claim is barred by the law-of-the-case doctrine, *see Hall v. State*, 91 Nev. 314, 316, 535 P.2d 797, 799 (1975) ("The doctrine of the law of the case cannot be avoided by a more detailed and precisely focused argument subsequently made after reflection upon the previous proceedings."), and therefore no relief is warranted.

phase hearing as alleged" and that trial counsel ineffectively examined witnesses, ineffectively cross-examined the prosecution's forensic expert, and failed to object to the improper admission of his prior convictions. These claims are not supported by cogent argument but only by citations to his postconviction petition, and therefore we decline to address them. *See Maresca*, 103 Nev. at 673, 748 P.2d at 6.

*Omitted appellate-counsel claims*

Weber argues that the district court erred by denying his claims that postconviction counsel was ineffective for not challenging appellate counsel's failure to raise a number of issues on direct appeal.[3]

*Jury selection matters*

Weber argues that postconviction counsel should have challenged appellate counsel's failure to argue that: (1) pretrial publicity rendered his trial unfair, (2) the trial court should have excused several potential jurors who indicated that they had already determined his guilt, (3) the trial court should have excused four seated jurors who indicated that they believed that a defendant had an obligation to establish his innocence and five jurors who were predisposed to the death penalty, and

---

[3]We do not address several of Weber's claims that postconviction counsel should have asserted that appellate counsel was ineffective because he failed to present cogent argument. *Maresca*, 103 Nev. at 673, 748 P.2d at 6. Those claims relate to appellate counsel's failure to challenge his convictions and death sentence as invalid because the tenure of judges of the Nevada state district courts and the Justices of this court are dependent upon popularly contested elections, failure to raise issues identified as claims 18, 25, and 27 in his postconviction petition, and failure to raise unidentified instances of prosecutorial misconduct during arguments in the guilt and penalty phases of the trial.

(4) the trial court should have excused several seated jurors because they or their family members had been the victim of some sort of sexually-related incident. Because he has not shown that any of the jurors were unfair or biased for any of the reasons he suggests, he has not established viable appellate issues that were unreasonably omitted by appellate counsel. And, as a result, he has not established that postconviction counsel was ineffective for omitting these appellate-counsel claims.[4]

Weber further contends that postconviction counsel should have asserted that appellate counsel was ineffective for not arguing that the trial court erred in excusing three death scrupled veniremembers. Each of the three veniremembers were properly excused from the venire because they expressed views against the death penalty that would have prevented or substantially impaired the performance of their duties as jurors. See *Lockhart v. McCree*, 476 U.S. 162, 165 (1986); NRS 175.036(1). Because the record therefore does not support a challenge to appellate counsel's omission of this issue, Weber has not demonstrated that prior

---

[4]To the extent Weber argues that the trial court erred by refusing to change venue, allow individualized voir dire to ascertain the impact of pretrial publicity, and sequester the jury, those claims were appropriate for direct appeal and therefore are procedurally barred absent a demonstration of good cause and prejudice. NRS 34.810(1)(b)(2), (3). Because he has not articulated good cause for failing to raise these claims sooner, no relief is warranted. Weber further argues that we should revisit this court's decision on direct appeal regarding the trial court's denial of two for-cause challenges in light of his new argument that the intense pretrial publicity surrounding his case made it impossible to impanel a fair and impartial jury. We reject this argument, especially where he has still not shown that any seated juror was biased based on pretrial publicity or for any other reason.

postconviction counsel was ineffective for not raising this appellate-counsel claim.

*Pornography*

Weber argues that postconviction counsel should have asserted that appellate counsel was ineffective for not arguing that there was insufficient evidence to support the conviction for possession of child pornography because no evidence established that he exercised control over the pornographic images found on the computer and floppy disks retrieved from the home. We conclude that appellate counsel's omission of this sufficiency challenge was not ineffective as a rational trier of fact could find Weber guilty beyond a reasonable doubt based on testimony that the computer and floppy disks containing the child pornography belonged to and were used by Weber. *See Origel-Candido v. State*, 114 Nev. 378, 381, 956 P.2d 1378, 1380 (1998); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). While other people living in the home had access to the computer and some of them used it to play video games or type school reports, a rational juror could reasonably infer from the evidence presented that Weber possessed pornographic images of children. *See* NRS 200.730; *Palmer v. State*, 112 Nev. 763, 768-69, 920 P.2d 112, 115 (1996). Because any sufficiency challenge would have been rejected had appellate counsel raised it, postconviction counsel was not ineffective for omitting this appellate-counsel claim.

*Jury instructions*

Weber also argues that postconviction counsel should have asserted that appellate counsel was ineffective in failing to challenge the "actual and substantial" and "govern and control" language in the reasonable doubt instruction. As the instruction given did not include the

SUPREME COURT
OF
NEVADA

(O) 1947A

word "substantial," postconviction counsel could not fault appellate counsel on this point. And because challenges to the "govern and control" language had been rejected, *see, e.g., Ramirez v. Hatcher*, 136 F.3d 1209, 1213 (9th Cir. 1998); *Elvik v. State*, 114 Nev. 883, 897-88, 965 P.2d 281, 290-91 (1998), postconviction counsel similarly could not fault appellate counsel for not challenging that part of the instruction, *see In re Reno*, 283 P.3d 1181, 1212 (Cal. 2012) (explaining that habeas counsel's failure to raise claims previously rejected in other cases is not objectively unreasonable where there is no legitimate and asserted ground for revisiting the issue). Absent any merit to this appellate-counsel claim, postconviction counsel cannot be faulted for omitting it.

Weber next argues postconviction counsel should have asserted that appellate counsel was ineffective for not challenging the torture-murder instruction on the ground that the instruction did not include all of the requisite elements of the offense. However, the instruction comports with the law, *see Rippo v. State*, 113 Nev. 1239, 1263, 946 P.2d 1017, 1032 (1996), and Weber does not identify what elements were omitted from the instruction. As postconviction counsel could not have successfully challenged appellate counsel's failure to challenge this instruction upon the ground he asserts here, postconviction counsel was not ineffective for omitting this claim.

Weber also argues that postconviction counsel should have asserted that appellate counsel was ineffective for not arguing that the jury was incorrectly instructed that it could convict him of murder and kidnapping if it merely found that A.G. was physically restrained, thereby relieving the State of its burden to prove every element of the kidnapping beyond a reasonable doubt. At the time of Weber's trial and direct appeal,

we had held that physical restraint in itself was sufficient to establish kidnapping distinct from an associated offense (here, murder). *Clem v. State*, 104 Nev. 351, 354, 760 P.2d 103, 105 (1988), *overruled on other grounds by Zgombic v. State*, 106 Nev. 571, 798 P.2d 548 (1990), *superseded by statute on other grounds as stated in Steese v. State*, 114 Nev. 479, 960 P.2d 321 (1998). The instruction used here was consistent with language in *Clem*. Because the instruction given was a correct statement of law at the time of Weber's trial and direct appeal, appellate counsel cannot be faulted for not challenging it on appeal. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Moreover, there was little likelihood of success on the merits had this claim been raised on appeal for two reasons. First, the State's theory on this offense was not dependent on restraint but instead focused more on Weber's conduct when he lied to A.G. to get him to go home and then took A.G. home with the intent to kill him. Second, we indicated in *Mendoza v. State*, that the test now asserted by Weber does not apply when the associated offense underlying first-degree kidnapping is murder.[5]   122 Nev. 267, 275 n.19, 130 P.3d 176, 180 n.19 (2006).

---

[5]We acknowledge that shortly after *Mendoza*, this court nonetheless applied that test where murder was the associated offense underlying a first-degree kidnapping conviction. *See Pascua v. State*, 122 Nev. 1001, 1006, 145 P.3d 1031, 1034 (2006). *Pascua* does not mention footnote 19 in *Mendoza*. Even if the test applied here, a challenge to the instruction would not have resulted in a different outcome on direct appeal because
*continued on next page . . .*

Because there is no merit to either prong of the appellate-counsel claim, postconviction counsel was not ineffective for omitting it.

Weber argues that postconviction counsel should have asserted that appellate counsel was ineffective for not challenging the instructions on malice, anti-sympathy, and equal and exact justice. Because this court had repeatedly upheld those instructions, *see Byford v. State*, 116 Nev. 215, 232, 994 P.2d 700, 712 (2000) (upholding malice instruction where the jury is properly instructed on the presumption of innocence); *Sherman v. State*, 114 Nev. 998, 1011, 965 P.2d 903, 912 (1998) (upholding anti-sympathy instruction where trial court also instructs the jury to consider mitigating facts); *Leonard v. State*, 114 Nev. 1196, 1209, 969 P.2d 288, 296 (1998) (upholding equal and exact justice instruction), appellate counsel's failure to challenge the instructions did not fall below an objective standard of reasonableness and, consequently, postconviction counsel was not ineffective for omitting this appellate-counsel claim.

*Deadly weapon enhancement*

Weber next argues postconviction counsel should have asserted that appellate counsel was ineffective for not challenging the

---

*. . . continued*

the evidence establishes that the movement and physical restraint of A.G. substantially exceeded that required to complete the murder. *See id.* ("Although we are cognizant that seizure, restraint, or movement often occurs incidental to the underlying offense of murder, there are certainly situations in which such seizure, movement, or restraint substantially exceeds that required to complete the murder. For example, dual convictions could stand where the object is murder and the victim is kidnapped for that purpose.").

deadly-weapon-enhancement instruction on the ground that it is unconstitutionally vague. We had rejected a similar constitutional challenge to the definition of a "deadly weapon" in *Hernandez v. State*, 118 Nev. 513, 527-28, 50 P.3d 1100, 1110 (2002), which was decided before Weber's direct appeal. Considering the controlling law at the time of the direct appeal, appellate counsel's omission of this issue did not fall below an objective standard of reasonableness. And for that reason, prior postconviction counsel's omission of this appellate-counsel claim also was not deficient. Weber's alternative, sufficiency-of-the-evidence basis for an appellate-counsel claim also falls on the deficiency prong because, based on the evidence presented at trial, the sufficiency challenge does not appear to be so strong that its omission could be characterized as falling below the objective standard of reasonableness that governs counsel's performance. A rational juror could reasonably conclude beyond a reasonable doubt that the various implements used to kill A.G. and Kim were "instrument[s] [or] material[s] . . . which, under the circumstances in which [they were] used . . . [were] readily capable of causing substantial bodily harm or death." NRS 193.165(6)(b) (defining "deadly weapon"). As there was no basis on which postconviction counsel could have successfully challenged appellate counsel's failure to challenge the deadly weapon enhancement, postconviction counsel was not ineffective for omitting this claim.

*Penalty-phase claims*

*Weighing instruction*

Weber claims that postconviction counsel should have asserted that appellate counsel was ineffective for not challenging an instruction that did not advise the jury that the aggravating circumstances had to

SUPREME COURT
OF
NEVADA

(O) 1947A

outweigh the mitigating circumstances beyond a reasonable doubt before the jury could impose a death sentence. Although the cases that have been asserted as support for such an instruction (*Ring v. Arizona*, 536 U.S. 584 (2002) and *Johnson v. State*, 118 Nev. 787, 59 P.3d 450 (2002)) were available at the time of Weber's direct appeal, trial counsel did not request such an instruction and therefore appellate counsel would have been faced with a plain-error standard. For that reason, it is questionable whether appellate counsel's omission of this issue fell below an objective standard of reasonableness. But even if postconviction counsel could have demonstrated that appellate counsel's performance was deficient, our decisions in *McConnell v. State*, 125 Nev. 243, 254, 212 P.3d 307, 314-15 (2009), which concluded that nothing in the relevant statutory language imposed a beyond-a-reasonable-doubt standard on the weighing of aggravating and mitigating circumstances, and *Nunnery v. State*, 127 Nev., Adv. Op. 69, 263 P.3d 235, 250-53 (2011), which concluded that the weighing of aggravating and mitigating circumstances is not subject to the beyond-a-reasonable-doubt standard, establish that there was no reasonable probability of success had this issue been raised by appellate counsel. *See also Carr*, ___ U.S. at ___, 136 S. Ct. at 642 ("[O]f course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy—the quality of which, as we know, is not strained. It would mean nothing, we think, to tell the jury that the defendants must deserve mercy beyond a reasonable doubt; or must more-likely-than-not deserve it."). As such, postconviction counsel could not have established the prejudice prong of the appellate-counsel claim. Because the appellate-counsel claim ultimately would have

had no merit, Weber suffered no prejudice based on postconviction counsel's omission of it.

*Constitutionality of the aggravating circumstances*

Weber contends that postconviction counsel should have asserted a number of appellate-counsel claims related to the validity of the sexual assault, torture, and felony aggravating circumstances.

*Sexual assault aggravating circumstances*

Weber argues that postconviction counsel should have asserted that appellate counsel was ineffective for not challenging the aggravating circumstances based on his four convictions for sexually assaulting M.G. on the ground that the jury was not instructed that it had to find beyond a reasonable doubt that those convictions involved the use or threat of violence, as required by NRS 200.033(2)(b).

The jurors were instructed that first-degree murder may be aggravated where the "murder was committed by a person who, at any time before a penalty hearing is conducted for the murder, is or has been convicted of a felony involving the use or threat of violence to the person of another," specifically the sexual assault counts related to M.G. The jurors were further instructed that they "must find the existence of each aggravating circumstance, if any, unanimously and beyond a reasonable doubt" and were given the statutory reasonable doubt instruction, NRS 175.211. We are not convinced that the instruction relieved the prosecution of its burden of proof. But even if it did, this court's analysis of these aggravating circumstances in the context of its mandatory review of the death sentence on direct appeal indicates that a challenge to the instruction would not have resulted in relief on appeal. Specifically, in upholding the sexual assault aggravating circumstances, this court

concluded that the record established that Weber used or threatened violence when he sexually assaulted M.G. *Weber*, 121 Nev. at 586, 119 P.3d. 129. Given that ruling, postconviction counsel was not ineffective for omitting this appellate-counsel claim.

*Torture aggravating circumstance*

Weber argues that postconviction counsel should have asserted that appellate counsel was ineffective for not challenging the torture aggravating circumstance on three grounds.

First, he argues that appellate counsel should have argued that the aggravating circumstance was not supported by sufficient evidence showing that he intended to inflict pain and suffering or that any torture occurred beyond the act of killing A.G. We conclude that postconviction counsel would not have been able to establish that appellate counsel's omission of this issue was deficient. Because this court was already required under NRS 177.055(2) to review the sufficiency of the evidence regardless of whether the issue was raised by counsel, it would not be objectively unreasonable for appellate counsel to focus their presentation on other issues, particularly considering the page limits on appellate briefs. Additionally, this court's mandatory review of this aggravating circumstance on direct appeal and conclusion that sufficient evidence supported it, *Weber*, 121 Nev. 587, 119 P.3d at 130, belies any argument that appellate counsels' omission of the issue prejudiced Weber. Because the appellate-counsel claim was without merit, postconviction counsel was not ineffective for omitting it.

Second, Weber asserts that appellate counsel should have argued that the torture aggravating circumstance failed to sufficiently narrow the class of defendants eligible for the death penalty because it

"overlapped with the definition of 'murder by torture.'" In *Hernandez v. State*, this court held "the definition of torture murder performs a constitutionally satisfactory narrowing function" and therefore the State is allowed to charge first-degree murder by torture and allege an aggravating circumstance based on the same act or acts of torture. 124 Nev. 978, 983-85, 194 P.3d 1235, 1239-40 (2008), *overruled on other grounds by Armenta-Carpio v. State*, 129 Nev., Adv. Op. 54, 306 P.3d 395 (2013). Given that holding, Weber was not prejudiced by postconviction counsel's omission of this appellate-counsel claim.

Third, Weber contends that appellate counsel should have argued that the torture aggravating circumstance is unconstitutionally vague and overbroad because this court has inconsistently adhered to the requirement that the torture must be beyond the act of killing itself. His substantive attack on the aggravating circumstance lacks merit as a general matter and as specifically applied in this case. Therefore, he was not prejudiced by postconviction counsel's omission of this appellate-counsel claim.

*Redundant felony aggravating circumstances*

Weber argues that postconviction counsel should have asserted that appellate counsel was ineffective for not challenging the felony aggravating circumstances that were based on his burglary and kidnapping convictions on the ground that they were redundant to the charges of murder because neither had an independent purpose apart from the killing. The redundancy analysis, which focuses on whether multiple convictions for the same or different offenses are permissible (and has recently been rejected by this court), *see Jackson v. State*, 128 Nev., Adv. Op 55, 291 P.3d 1274, 1281-82 (2012) (observing that redundancy

centers on whether the "fact-based same conduct" may support multiple convictions), does not work in this context because the felony aggravating circumstances are not substantive offenses. The fact that these aggravating circumstances are related to the circumstances of the killing is not unusual. Thus, even if appellate counsel's failure to come up with this novel argument fell below an objective standard of reasonableness, that omission did not prejudice Weber. Postconviction counsel therefore was not ineffective for omitting this appellate-counsel claim.

Weber next contends that postconviction counsel should have asserted that appellate counsel was ineffective for not challenging the prior-violent-felony-conviction aggravating circumstance under NRS 200.033(2)(b) based on kidnapping A.G. because the State also used A.G.'s kidnapping to support an aggravating circumstance under NRS 200.033(4). NRS 200.033(2)(b) provides that first-degree murder may be aggravated where the defendant has a prior conviction for a "felony involving the use or threat of violence to the person of another and *the provisions of subsection 4 do not otherwise apply to that felony.*" (Emphasis added). Subsection 4 provides that first-degree murder may be aggravated where a defendant committed the murder during the commission (or attempted commission) of an enumerated felony, including kidnapping. Because the State alleged that A.G.'s murder was aggravated because it was committed during a kidnapping, it could not also seek the death penalty by using Weber's *conviction* for kidnapping A.G. as a separate aggravating circumstance. While appellate counsel should have challenged this dual use of A.G.'s kidnapping and postconviction counsel should have raised the appellate-counsel claim, the elimination of this aggravating circumstance would not have led to a different outcome on

appeal or in the prior postconviction proceeding. In particular, after striking an aggravating circumstance, this court would have reweighed the aggravating and mitigating circumstances or conducted a harmless-error review. *See Clemons v. Mississippi*, 494 U.S. 738, 741 (1990). Considering the numerous remaining aggravating circumstances and the mitigating evidence presented, we conclude that there is no reasonable probability that this court would have reversed the death sentence. Therefore, Weber cannot show prejudice based on postconviction counsel's omission of this claim.[6]

*Issues related to burglary*

Weber argues that postconviction counsel should have challenged appellate counsel's failure to challenge the aggravating circumstance based on burglary and his burglary convictions. Weber asserts that the issue unreasonably omitted by appellate counsel is a constitutional challenge to Nevada's definition of burglary on the ground that it is overbroad and vague because it applies to a person who enters his own home with the intent to commit larceny or a felony. But the omitted appellate argument is more properly described as a challenge to the sufficiency of the evidence to support the burglary aggravating circumstance and convictions and that is the way it was presented in the petition filed below.

Recently in *State v. White*, we explained that under Nevada law "a person with an absolute right to enter a structure cannot commit

---

[6]Pursuant to NRS 200.033(2)(b), we strike the prior-violent-felony-conviction aggravating circumstance that was based on Weber's conviction for kidnapping A.G.

burglary of that structure." 130 Nev., Adv. Op. 56, 330 P.3d 482, 485-86 (2014). The State therefore had the burden to prove that Weber did not have an absolute, unconditional right to enter the home at the time the crimes occurred. *See People v. Gill*, 70 Cal. Rptr. 3d 850, 866 (Ct. App. 2008) (observing that the prosecution "must prove that a defendant does not have an unconditional possessory right to enter his or her family residence" to sustain a burglary conviction). As *White* merely articulated the substantive law on burglary as it has always been in Nevada, appellate counsel could have challenged the burglary convictions and felony aggravating circumstance.

Whether appellate counsel's failure to do so and postconviction counsel's failure to raise the appellate-counsel claim fell below an objective standard of reasonableness and prejudiced the defense is not entirely clear from the record. The evidence presented at trial seems to show that Weber moved into the family's residence early in his relationship with Kim and that, although he moved out on occasion when the relationship was on the rocks and kept personal belongings at both the family's home and his mother's home, Weber had resumed his relationship with Kim about one week before the murders and was living in her house at that time. This evidence thus suggests that Weber had an absolute, unconditional right to enter the home at the time of the murders. The evidence is less clear with respect to the second burglary charge related to the events of April 14, 2002. At that point, Weber had killed Kim and A.G. and fled Las Vegas, so he arguably no longer had an absolute, unconditional right to enter the home. *Cf. People v. Ulloa*, 102 Cal. Rptr. 3d 743 (Ct. App. 2009) (discussing various circumstances where defendant may no longer have unconditional possessory right to enter residence).

Under the circumstances, we conclude that an evidentiary hearing is warranted to determine whether the postconviction-counsel claim has merit as to the failure to assert an appellate-counsel claim based on the omitted challenge to the burglary convictions.

In contrast, even if a challenge to the burglary aggravating circumstance would have been successful, Weber cannot demonstrate the prejudice prong of the ineffective-assistance claim. Although a successful challenge to the aggravating circumstance might have resulted in this court striking the aggravating circumstance, it would not have afforded Weber relief from the death sentence. In particular, after reweighing the aggravating and mitigating circumstances or conducting a harmless-error review, we conclude that there is no reasonable probability that this court would have reversed the death sentence considering the numerous remaining aggravating circumstances and the mitigating evidence presented. Therefore, Weber failed to demonstrate prejudice resulting from postconviction counsel's failure to raise an appellate-counsel claim challenging this aggravating circumstance.[7]

---

[7]To the extent Weber argues that he is actually innocent of the death penalty due to the invalidity of the aggravating circumstances, his claim lacks merit. After striking the prior-violent-felony-conviction aggravating circumstance based on Weber's conviction for kidnapping A.G. and even accepting his argument regarding the aggravating circumstance based on burglary, other valid aggravating circumstances remain and therefore he is not actually innocent of the death penalty. *See Lisle v. State*, 131 Nev., Adv. Op. 39, 351 P.3d 725, 734 (2015) (observing that only aggravating circumstances are relevant to a gateway claim that the defendant is actually innocent of the death penalty).

*Cumulative error*

Weber contends that based on the cumulative effect of postconviction counsel's failure to raise the claims argued here, there is a reasonable probability that the result of the prior postconviction proceeding would have been different. Assuming that multiple deficiencies in counsel's performance may be considered cumulatively to establish prejudice, *see McConnell v. State*, 125 Nev. 243, 259 n.17, 212 P.3d 307, 318 n.17 (2009), we are not convinced that the cumulative deficiencies in postconviction counsel's performance—omitting appellate-counsel claims challenging the prior-violent-felony-conviction aggravating circumstance based on his kidnapping conviction, the felony aggravating circumstance based on burglary, and the burglary convictions—prejudiced Weber.[8]

---

[8]We reject Weber's contention that the district court erred by denying his claim that the cumulative effect of the errors committed at trial, on direct appeal, and during postconviction proceedings entitle him to a new trial and penalty hearing. Finally, we reject Weber's argument that postconviction counsel should have asserted that appellate counsel was ineffective for not arguing that execution by lethal injection as administered in Nevada constitutes cruel and unusual punishment. *See McConnell v. State*, 125 Nev. 243, 246-49, 212 P.3d 307, 310-11 (2009) (holding that challenge to lethal injection protocol is not cognizable in postconviction habeas proceedings).

Having considered Weber's claims, we

ORDER the judgment of the district court AFFIRMED IN PART AND REVERSED IN PART and REMAND this matter for an evidentiary hearing based on the omitted challenge to the burglary convictions.[9]

_____, C.J.
Parraguirre

_____, J.
Hardesty

_____, J.
Douglas

_____, J.
Cherry

_____, J.
Gibbons

PICKERING, J., concurring in part and dissenting in part:

In 2003, a jury convicted Weber of 17 felonies, including two counts of murder, and sentenced him to death. The 15 non-murder felony convictions were for acts associated with the murders, including two burglary convictions, for unlawfully entering the victims' residence with intent to commit felonies therein. Weber appealed, this court affirmed, *Weber v. State*, 121 Nev. 554, 119 P.3d 107 (2005), and in 2006, the United States Supreme Court denied certiorari, *Weber v. Nevada*, 546 U.S. 1216 (2006). There followed Weber's first petition for habeas corpus, which the district court denied, which order this court affirmed on appeal, *Weber v.*

_____

[9]The Honorable Nancy Saitta, Justice, did not participate in the decision in this matter.

*State*, Docket No. 50613 (Order of Affirmance, July 20, 2010); and Weber's second petition for habeas corpus, which the district court denied in December of 2012, from which Weber again appealed. It is this appeal from the district court's order denying Weber's second petition for a writ of habeas corpus that is now before the court.

The majority upholds the district court's order denying Weber's second petition for habeas corpus as to his murder convictions and the sentence of death he received. However, it reverses and remands for an evidentiary hearing on Weber's claim that first postconviction counsel was ineffective for not asserting a claim that appellate counsel was ineffective in not challenging Weber's burglary convictions on direct appeal. The majority orders these further proceedings even though the majority also finds, *ante* at 29, that assuming Weber succeeds in eliminating the burglary convictions, this will not, as a matter of law, "afford[ ] Weber relief from the death sentence," because Weber's murder conviction and death sentence stand with or without the burglary convictions as aggravators. While I otherwise join the majority's order, I submit that the burglary convictions are final and unreviewable except to the extent they affect the death sentence, which the majority holds, as a matter of law, they do not. I therefore would not remand this matter for an evidentiary hearing but would instead affirm the district court's order in its entirety.

The special rules afforded postconviction petitioners sentenced to death—the statutory right to the appointment of first postconviction counsel, NRS 34.820, and the right to the effective assistance of that counsel, *Crump v. Warden*, 113 Nev. 293, 303, 934 P.2d 247, 253 (1997); *McKague v. Warden*, 112 Nev. 159, 165 n.5, 912 P.2d 255, 258 n.5 (1996)—

are a departure from the rule that otherwise limits habeas corpus petitioners to one time through the system. Given the unique and irrevocable nature of the death penalty, the Legislature deemed it appropriate to provide additional protections for those petitioners facing the ultimate sentence. But those protections, I believe, extend solely to matters that subject a defendant to the death penalty. *Cf. McKinney v. State*, 992 P.2d 144, 154 (Idaho 1999) (noting that postconviction procedures affording additional review in death penalty cases do not extend to non-death sentences imposed on related convictions obtained in the same underlying trial).

There is a long-standing legal maxim that "where the reason of a rule cease[s] the rule also cease[s]." *Funk v. United States*, 290 U.S. 371, 384 (1933); *see also Reno Smelting, Milling & Reduction Works v. Stevenson*, 20 Nev. 269, 279, 21 P. 317, 320 (1889) ("It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a case where that reason utterly fails—*cessante ratione legis, cessat ipsa lex*."). Here, the reason behind the additional review NRS 34.820 affords, in our interpretation of it, ceases to exist with respect to postconviction-counsel claims based on matters that do not subject a defendant to capital punishment, as to which the judgment of conviction has become final. It naturally follows that a second postconviction petition should be limited only to postconviction-counsel claims related to the capital offense and the death sentence. To cast a wider net to capture matters related to Weber's burglary convictions that have no bearing on the capital offense or the death sentence is, in my view, a misuse of the judicial process and contributes to the seemingly endless delays in bringing capital cases to a close.

Therefore, while I concur in large part, I respectfully dissent from the majority's decision to remand this matter for an evidentiary hearing on Weber's postconviction-counsel claim related to his burglary convictions.

_____, J.
Pickering

cc:   Hon. Douglas Smith, District Judge
Federal Public Defender/Las Vegas
Attorney General/Carson City
Clark County District Attorney
Eighth District Court Clerk